Commonwealth *v.* Garvin, Appellant.

Submitted January 10, 1972. Before JONES, C. J. EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Neil Leibman,* for appellant.

*Maxine J. Stotland* and *Milton M. Stein,* Assistant District Attorneys, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE NIX, June 28, 1972:

Benjamin Garvin, Jr., was arrested in Philadelphia and charged with aggravated robbery and burglary. On April 24, 1970, after waiving a jury trial, he was con-

victed of both charges and sentenced to concurrent terms of imprisonment of not less than two years nor more than twenty years. Post-trial motions were denied and on appeal the Superior Court affirmed per curiam without opinion. This Court granted allocatur.

On August 14, 1969, at about 1:30 p.m., Mrs. Ferro, the owner of a beauty salon, was in her shop with her friend, Mrs. Maloney, when the appellant and his accomplice, Thomas Leging, entered and announced their intention of robbing the two ladies. While the intruders were in the shop, Leging produced a gun to support their demands for money and Garvin struck Mrs. Maloney, knocking her to the floor, and removed $68.00 from her purse. The Commonwealth's testimony established that the two men were in the presence of the victims for approximately five minutes, the lighting conditions were good and the ladies had ample opportunity to observe both men. Shortly after the men fled the police apprehended Leging, who subsequently entered a plea of guilty in a separate proceeding.

The first assignment of error was the lower court's refusal to suppress the identification evidence which they contended to be the fruits of an illegal arrest. This challenged arrest of Garvin occurred approximately three weeks later on September 4, 1969, when Officer Covotta, a member of the Philadelphia Police Department, received information by telephone as to the whereabouts of the appellant. He immediately proceeded to the designated location and placed him under arrest. After taking Garvin into custody, Officer Covotta took him directly to the beauty salon where Mrs. Ferro identified him as the other man in the holdup. Both Mrs. Ferro and Mrs. Maloney made positive in-court identifications of Garvin at the trial.

It is significant that there has been no objection raised by the appellant to the manner in which the out-

of-court confrontation with Mrs. Ferro was conducted or the absence of counsel at that time. Further, the request for suppression of the identification was made without distinction between the in-court and out-of-court identifications and was predicated solely on the theory that each was a fruit of an illegal arrest. Therefore, the issue as framed is whether the arrest was illegal and if the arrest is determined to have been illegal, whether the subsequent identification was tainted by that illegality.

The legality of an arrest without a warrant must depend upon the presence of probable cause. *Ker v. California,* 374 U.S. 23 (1963) ; *Commonwealth v. Bishop,* 425 Pa. 175, 228 A. 2d 661 (1967). In *Bishop,* this court held that probable cause exists if the facts and circumstances which are within the knowledge of the officer at the time of arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. 425 Pa. at 181, 228 A. 2d at 664-65. *See also, Commonwealth v. Murray,* 437 Pa. 326, 263 A. 2d 886 (1970) ; *Commonwealth v. Brayboy,* 431 Pa. 365, 246 A. 2d 675 (1968).

A review of the record in this case forces us to conclude that the arresting officer did not possess sufficient knowledge to make a determination as to the reliability of the information received. The United States Supreme Court in *Aguilar v. Texas,* 378 U.S. 108 (1964), mandated that before issuing a warrant a magistrate was required to be supplied with sufficient evidence which would permit him to make an independent judgment of the informant's reliability. *Accord, United States v. Harris,* 403 U.S. 573 (1971) ; *United States v. Ventresca,* 380 U.S. 102 (1965) ; *Jones v. United States,* 362 U.S. 257 (1960). Although *Aguilar* involved

a search warrant, the Supreme Court has subsequently stated in a discussion of *Aguilar's* standards that the judgment required of a magistrate in passing on the validity of a search warrant is basically the same as that involved when an arresting officer is determining probable cause for an arrest without a warrant. *Spinelli v. United States,* 393 U.S. 410, 417 & n.7 (1969). Specifically, the Supreme Court has held that "less stringent standards for reviewing the officer's discretion in effecting a warrantless arrest and search would discourage resort to the procedures for obtaining a warrant. Thus, the standards applicable to the factual basis supporting the officer's probable-cause assessment at the time of the challenged arrest and search are at least as stringent as the standards applied with respect to the magistrate's assessment." *Whiteley v. Warden,* 401 U.S. 560, 566 (1971).

The pertinent testimony in the instant case revealed that Officer Covotta of the Philadelphia Police Department received a telephone call at approximately 2:40 p.m., on September 4, 1969. The call was from an informant who was known to the officer and who had supplied him with information during the past five years leading to six arrests and six convictions. However, with regard to this particular call, the record is contradictory and inadequate as to what portion of the information had been obtained by the informant's personal observation, if any, and what portion had been received by the informant from a third person who sought anonymity to avoid retaliation. The requirement of a determination of the trustworthiness of the source of the information cannot be met solely because it is channelled through an informant known to be reliable. While it may properly be assumed that the informant passed upon the reliability of the third person supplying the information to him, the law makes it most

clear that it is not his judgment to make. As the Supreme Court in *Aguilar, supra,* did not permit the officers to make the determination for the issuing authority we cannot permit the officer in a warrantless arrest to delegate his responsibility to the informant. To accept without question the messages of alleged eyewitnesses relayed through informants would be to totally disregard the Supreme Court's mandates. From the information received in the phone conversation, the officer was only aware that an unknown third person, who allegedly witnessed some portion of the robbery, identified one of the two participants as a man who was then walking on a particular street two blocks from the district at the time of the call.[1] When the officer arrived at the specified location there was nothing about the behavior of the appellant which would have furnished a basis for taking him into custody, and even though the record indicated the officer had been furnished with an identification by the victims, there is no testimony to suggest that he considered this information when he approached the appellant. On this record we find that the arrest of the appellant was illegal.

Although we agree with appellant as to the illegality of the arrest we must disagree with his contention that the identifications must be suppressed. No law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accusors. Thus, we conclude that the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome.

---

[1] Prior to this telephone conversation Officer Covotta had no reason to believe that there were any witnesses to the incident other than the two victims.

In discussing the scope of the effect of the prophylactic exclusionary rule where there has been an unlawful invasion by the Government, the United States Supreme Court in *Wong Sun v. United States,* 371 U.S. 471 (1963), stated: "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." 371 U.S. at 485.[2] Significantly, the Supreme Court made it clear that an illegal arrest does not bar all evidence subsequent to that arrest when it concluded: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" 371 U.S. at 487-88. The Supreme Court further recognized that the evidence should not be excluded when "the connection between the arrest and the . . . [evidence obtained] had 'become so attenuated as to dissipate the taint.'" 371 U.S. at 491.

In those cases where the exclusionary doctrine has been applied the questioned evidence derived so immediately from the unauthorized arrest that its relationship to the illegality was readily apparent. To fail to impose sanctions in those instances would "leave law-abiding citizens at the mercy of the officers' whim or caprice." *Brinegar v. United States,* 338 U.S. 160, 176 (1949). When, however, we are concerned with identification evidence where, as here, the testimonial evi-

---

[2] There is no question that this decision is a corollary of *Mapp v. Ohio*, 367 U.S. 643 (1961), and applies to state court trials as well as federal. *Traub v. Connecticut*, 374 U.S. 493 (1963); *Commonwealth v. Bishop*, 425 Pa. 175, 228 A. 2d 661 (1967).

dence did not derive from "exploitation" of any illegality, the reason to employ the sanction is non-existent.[3]

The illegal arrest in this instance merely provided the means for the confrontation with Mrs. Ferro more promptly than would otherwise have been the case. The arrest played no part in the identification of Mrs. Maloney who after the incident did not meet Garvin again until the day of the trial. We cannot assume that but for the illegal arrest the appellant would have remained at large indefinitely.[4] In either case, it is clear that the illegality contributed neither to the knowledge of the witnesses nor to the accuracy of their identifications.

Appellant also contends that the trial court erred in upholding the Commonwealth's privilege to withhold the identity of the informer. Historically, the purpose behind the privilege has been to further and protect the public interest in effective law enforcement. It is felt that this recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to the police, and by preserving their anonymity, encourages them to perform that obligation. It is correctly urged by appellant that the applicable case law in this area is found in *Roviaro v. United States*, 353 U.S. 53 (1957), and *Commonwealth v. Carter*, 427 Pa. 53, 233 A. 2d 284 (1967). However, both of these decisions can be distinguished from the instant case, and, therefore, we conclude that disclosure of the informer's identity is not required.

---

[3] For a detailed examination of the various philosophies involved in applying the exclusionary rule, *see* Oaks, *Studying the Exclusionary Rule in Search and Seizure*, 437 U. Chi. L. Rev. 665 (1970).

[4] Our view on this point was succinctly summarized in *United States v. Hoffman*, 385 F. 2d 501 (7th Cir. 1967), when it was stated that "it would be naive to assume that but for the unlawful arrests the trio would 'have blended back into the mass of population, and would have remained at large' as appellants contend." 385 F. 2d at 503 (footnote omitted).

In *Roviaro, supra,* the United States Supreme Court reversed a conviction for illegal transportation of narcotics where the Government, at trial, refused to identify the informer who was an undercover employee and who had actively participated in the crime. While the Supreme Court noted that the traditional rule has been that the prosecution is privileged to withhold disclosure of the identity of an informer, it also recognized that, logically, the scope of the privilege should be limited. In particular, the Supreme Court stated that "no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." 353 U.S. at 62. The Court then went on to formulate what has since become the general rule in the area: "Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." 353 U.S. at 62.

We adopted this "balancing test" in *Commonwealth v. Carter,* 427 Pa. 53, 233 A. 2d 284 (1967).[5] This Court thoroughly analyzed the *Roviaro* decision and found it to be "highly persuasive authority". 427 Pa. at 57 n.4, 233 A. 2d at 286 n.4. In *Carter,* as in *Roviaro,* the informer was the only material witness to the narcotics transaction other than the police and the accused himself. After applying the *Roviaro* test it was felt that "a 'consideration' of 'the possible defenses' and of 'the possible significance of the informer's testimony' weigh the balance heavily in favor of reversal" because of the

---

[5] For an analysis of this privilege of nondisclosure in other courts and in federal civil proceedings, *see* Annot., 76 A.L.R. 2d 262 (1961); 8 A.L.R. Fed. 6 (1971). *See also,* 8 Wigmore, Evidence, §2374 (McNaughten rev. 1961).

erroneous nondisclosure of the informer's identity. 427 Pa. at 60, 233 A. 2d at 287.

As the Commonwealth ably argues, the instant situation can be distinguished from both *Roviaro* and *Carter*. Significantly, those cases involved alleged narcotics transactions between the accused and an informant without non-police witnesses available. Whereas, here, the circumstances are different. In particular, there has been a positive identification of appellant by the two victims, based upon their observations during the robbery. The informant's personal observations, if any, are not crucial to the identification. Therefore, the lack of fundamental fairness in permitting the facts necessary for criminal guilt to be established solely by police testimony which compelled us in *Carter* to weigh the balance in favor of disclosure is not present. As we suggested in *Carter*, "disclosure might not be necessary in a case where police evidence as to crucial facts was corroborated by neutral witnesses. . . ." 427 Pa. at 61-62, 233 A. 2d at 288.

Therefore, we conclude that in the instant case, disclosure of the informant's identity is not essential. In fact, it is inconceivable to us how such disclosure would be helpful to appellant's defense. Here, the question is not whether a criminal act has been committed, a robbery obviously took place, but rather, whether the appellant was one of the perpetrators. Any testimony offered by the eyewitness informant would only serve to substantiate the positive identifications made by the two victims.

Appellant's final contention is that the trial judge, sitting without a jury, erred in placing no credence in the testimony of his accomplice, Thomas Leging. Leging, who had previously entered a plea of guilty, testified that the defendant was not the man who entered the beauty shop with him and participated in the robbery.

We find no merit in the argument that the trial judge improperly disbelieved this testimony.

The law is well settled that it is the exclusive province of the trier of facts to pass upon the credibility of witnesses and the weight to be accorded their testimony. Therefore, in the instant trial without a jury the determination on this question of Leging's credibility was for the trial judge to make. We will not disturb such a finding on appeal unless it is manifestly erroneous. See *Burbage v. Boiler Engineering & Supply Company, Inc.,* 433 Pa. 319, 249 A. 2d 563 (1969); *Holtz Will,* 422 Pa. 540, 222 A. 2d 885 (1966); *Stevenson v. Stein,* 412 Pa. 478, 195 A. 2d 268 (1963); *Commonwealth v. Lewis,* 193 Pa. Superior Ct. 508, 165 A. 2d 98 (1960); *Commonwealth v. Salkey,* 188 Pa. Superior Ct. 388, 147 A. 2d 425 (1958).

The judgment of the Superior Court affirming the judgment of sentence by the Philadelphia Court of Common Pleas, Trial Division, is affirmed.

Mr. Justice EAGEN concurs in the result.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I join in all of the majority's opinion except the assertion that Mrs. Ferro's out-of-court identification was not the "fruit" of the admittedly illegal arrest of appellant. See *Davis v. Mississippi,* 394 U.S. 721, 89 S. Ct. 1394 (1969); *Commonwealth v. Cephas,* 447 Pa. 500, 291 A. 2d 106 (1972).

However, since my review of the record convinces me that Mrs. Ferro's in-court identification was "based upon observations of . . . [appellant] other than the lineup identification . . .", *United States v. Wade,* 388 U.S. 218, 240, 87 S. Ct. 1926, 1939 (1967); *Commonwealth v. Futch,* 447 Pa. 389, 290 A. 2d 417 (1972), I believe that Mrs. Ferro's in-court identification was properly admitted.

DISSENTING OPINION BY MR. JUSTICE MANDERINO:

The majority's holding would permit the seizure of innocent citizens by government officials without the constitutional safeguards guaranteed by Article 1, Section 8, of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution.

In *Davis v. Mississippi*, 394 U.S. 721, 22 L. Ed. 2d 676, 89 S. Ct. 1394 (1969), fingerprints taken from a suspect after an illegal arrest were suppressed. The protections of the Fourth Amendment were specifically applied to evidence obtained using the suspect's *fingers* after an illegal seizure.

By definition an illegal seizure is the seizure of an innocent person. Such seizures are sometimes called investigatory. They are prohibited because as was stated in *Davis*, ". . . investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions'. . . ."

In this case after the illegal seizure of the defendant, evidence was obtained by using the suspect's *face*. The prohibition outlined in *Davis* is equally applicable. The identification evidence by Mrs. Ferro, the owner of the beauty shop, was a result of, and incident to, an illegal arrest. Under these circumstances, the identification evidence was the fruit of an illegal seizure and should have been suppressed prior to trial.

The majority opinion acknowledges that the record in the present case leads to the inescapable conclusion that the arrest of Benjamin Garvin, Jr., the appellant, was without probable cause and, therefore, illegal. Having acknowledged the seizure of the appellant was il-

legal, the majority reasons that the identification evidence should not be suppressed because, "The illegal arrest in this instance merely provided the means for the confrontation with Mrs. Ferro more promptly than would otherwise have been the case . . . we cannot *assume* that but for the illegal arrest the appellant would have remained at large indefinitely." (Emphasis supplied.)

Whether evidence, that is the direct result of an illegal seizure of a person, is to be suppressed, cannot be determined by the speculation of a court that the "illegally seized person" would not have remained at large indefinitely and the illegal arrest merely hastened the inevitable confrontation. The exclusion of the evidence *does not depend upon assumption or speculation* but depends solely upon the exclusionary rule explained in *Weeks v. United States,* 232 U.S. 383 (1914), and applied to the states through *Mapp v. Ohio,* 367 U.S. 643 (1961).

In *Wong Sun v. United States,* 371 U.S. 471 (1963), the United States Supreme Court in further defining the kind of evidence that is to be considered inadmissible as being illegally seized stated: "Thus, verbal evidence which derives so immediately from . . . an unauthorized arrest . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." The majority's interpretation that *Wong Sun, supra,* applies traditionally to physical, tangible material unreasonably restricts the use of the exclusionary rule and this restriction is not substantiated by the language in *Wong Sun.*

The logical and dangerous result of the majority's opinion, that identification evidence following an illegal arrest does not fall within the exclusionary rule, is to grant law enforcement officers an unfettered discretion to illegally seize any person or any number of persons on mere suspicion, secure in the knowledge that if by

chance a subsequent identification is obtained, the illegally seized individual will not have the right to suppress the tainted identification.

The conclusion the majority reaches ignores the purpose of the exclusionary constitutional rules by allowing subsequent discoveries from an illegal seizure to validate an arrest that was made without probable cause.

Accordingly, I would reverse and remand with the instruction to suppress the identification evidence as the fruit of an illegal seizure.